Earl R. Harwick v. Commissioner.
Harwick v. Commissioner
Docket No. 21057.
United States Tax Court
1949 Tax Ct. Memo LEXIS 58; 8 T.C.M. (CCH) 895; T.C.M. (RIA) 49243; October 4, 1949
*58 John H. Wahl, Jr., Esq., P.O. Box 1069, Miami 6, Fla., for the petitioner. N. A. Townsend, Jr., Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of $6,904.01 in petitioner's individual income tax for the calendar year 1944. The sole issue is whether respondent erred in determining that petitioner was not entitled in the year 1944 to deduct a casualty loss for a ship where the shipwreck occasioning the loss occurred in 1943. Findings of Fact Petitioner, a resident of Miami Beach, Florida, filed his income tax return for the year 1944 on the cash basis with the collector of internal revenue for the district of Florida. In June, 1943, petitioner bought a seagoing tug known as M. V. Guardian at Boston, Massachusetts, for the purpose of converting her for use in banana trade between Miami, Florida, and Caribbean ports. Later the ship was so converted and chartered by petitioner to the Tropical Fruit Co., whereby she was scheduled to make thirty trips between Miami, Florida, and Caribbean ports, for which petitioner was to receive $6,000 per trip. The cost of the Guardian to petitioner *59 was $54,493.40. The ship left Boston for Brooklyn, New York, in September 1943 and after there undergoing repairs, she arrived in Miami, Florida, about October 28, 1943. Prior to the ship's departure from Boston, petitioner arranged with Maurice Saval, an insurance broker in Boston, for hull and P. & I. [1] coverage on the vessel. The P. & I. coverage was placed by Saval with Fulton Brokerage & Indemnity Syndicate of New York, while the hull and engine insurance coverage was placed with Lloyd's of London, England. Saval was a United States correspondent for C. E. Heath & Co., Ltd., London, England, which in turn was a member of Lloyd's. The transaction was handled by Saval with Heath & Co., via transatlantic cables. The hull and engine coverage in the two policies obtained from Lloyd's was for a period of three months, beginning September 18, 1943, in the aggregate amount of $40,000, and was payable to petitioner in the event of a total loss or constructive total loss of the vessel; also full coverage occasioned by collision or loss resulting from fire. *60 Pursuant to custom, especially during war times, the originals of these policies were held in London. There was also delay in London in furnishing duplicate original copies of the policies and they were not mailed from London to Saval until December 29, 1943, and were delivered to petitioner by Saval in January 1944. Petitioner, being unfamiliar with the custom of retaining the originals in London, and not having received copies of the policies at the time of loss, was apprehensive as to the collectibility of the insurance. On the night of November 14, 1943, the Guardian, while sailing from Miami to Haiti, as result of engine trouble coupled with high seas, drifted aground on a reef off Barracoa, Cuba. The crew abandoned the vessel and went ashore. Cubans boarded the vessel and looted it of supplies and equipment. On November 22, 1943, petitioner first learned of the Guardian's fate in a cable from the United States Consul at Antilla, Cuba, advising him that she had been wrecked and that the crew needed funds. Petitioner by wire notified Saval in Boston, who told him to contact Lloyd's surveyor in Havana so that the company could determine whether or not the vessel was a total loss. *61 Petitioner then proceeded by air to Barracoa and arranged to take care of the crew and investigated salvage possibilities. There being no salvage facilities at Barracoa, he went to Havana and investigated the possibilities of salvaging the vessel and also contacted Stapleton, Lloyd's surveyor there, who first expressed the opinion the ship was a total loss, but the next day said the loss was only partial. Unable to make salvage arrangements, petitioner, about December 1, 1943, returned from Cuba to Miami and consulted M. J. Durant, an attorney of Miami, who had had some experience in marine insurance, for information and procedure as to his insurance coverage. Petitioner was in doubt as to whether he had insurance with Lloyd's since he had no policy or copy of one, and exhibited to his attorney the only evidence he had of insurance, being the socalled "cover note." His attorney, after examining it, was unable to tell what kind of insurance he had and advised the best way to ascertain whether or not he had insurance would be to "tender an abandonment of the vessel" and his attorney thereupon prepared in duplicate four documents, viz: (a) notice of abandonment of the motor vessel "Guardian"; *62 (b) certificate of ownership, issued by United States Customs, at Miami, Florida; (c) affidavit of the Master of the "Guardian"; (d) photostat copy of the Master's Marine Protest, one set being sent to Stapleton, Lloyd's surveyor at Havana, and the other to Saval in Boston. Saval received same on December 9, 1943, and forwarded them to Heath & Co., in London. Petitioner continued to make inquiries about salvaging the Guardian, his last letter on that subject being written December 27, 1943, to a Cuban contractor. On December 28, 1943, Stapleton, Lloyd's surveyor in Havana, advised petitioner that he had sold the salvage of the Guardian for $1,750 for the benefit of the underwriters, since the vessel was considered by him to be a total loss, whereupon petitioner drew a draft upon Saval for the insurance, which draft was declined and not paid. Thereafter, on January 10, 1944, petitioner surrendered his title certificate for the Guardian to the United States Deputy Collector of Customs in Miami, and advised that official that the vessel had grounded and sunk. On December 28, 1943, Saval wrote petitioner, requesting that a statement of all insurance in force at the time of the loss and *63 a statement authorizing Heath & Co. to collect the loss would have to be furnished. On December 29, 1943, petitioner received a telegram of that date from Saval, reading: "Received following cable from Heath: 'Guardian Underwriters decline abandonment but agree place assured in same position as if writ issued on twenty second instant.'" Petitioner showed this wire to his attorney who was uncertain as to its meaning and advised that it might mean the company was declining liability, whereupon petitioner wired Saval in reply that he did not understand its meaning, and Saval in a lengthy letter dated December 30, 1943, sought to explain its technical meaning which still was not clear to petitioner. Having become discouraged in his efforts to collect the insurance, shortly after January 1, 1944, petitioner went to Boston and remained there until after January 25, 1944, being in daily contact with Saval seeking to negotiate settlement of his claim, and during this period he and Saval contacted Heath & Co. in London and Stapleton in Havana for information about the current status of petitioner's claim. After numerous interviews, on January 25, 1944, Saval advanced petitioner $38,000 *64 of the insurance due and the balance was paid petitioner on March 13, 1944. In addition to insurance collected from Lloyd's, petitioner collected $1,391.46 on his P. & I. coverage in February, 1944. The petitioner was sued by one member of the crew but the suit was defended by the P. & I. insurance underwriter. In the year 1943 petitioner, while expecting to be able to collect insurance for his loss, did not know what amount, if any, he would be able to collect. Petitioner filed an original and an amended income tax return for the calendar year 1944 in which he claimed deduction on account of the Guardian shipwreck, and in his amended return his loss, after the collection of insurance on the vessel, was placed at $13,563.26, which amount the parties agree to be correct. The Commissioner's disallowance is based alone upon the fact that the casualty loss having occurred in 1943 is not allowable as a deduction for the year 1944. Opinion The parties are agreed that after the collection of insurance on the vessel, petitioner sustained a casualty loss resulting from the shipwreck of the Guardian in the sum of $13,563.26. The shipwreck occurred on November 14, 1943, while the settlement *65 and collection of petitioner's claim against the insurance companies was not had until the year 1944. The petitioner claimed the deduction for the loss in 1944, while the Commissioner disallowed it on the ground that the casualty, having occurred in 1943, was not deductible in 1944. Petitioner's claim for deduction is based upon section 23(e)(3), I.R.C.
Where a loss is covered by insurance and there is a reasonable prospect of some recovery from the insurance, deduction is permissible in the year of final determination of the insurance claim. Allied Furriers Corp., 24 B.T.A. 457; Rose Licht, 37 B.T.A. 1096. This is a reasonable and sensible interpretation of the law, for until the insurance claim is determined, the taxpayer cannot know the amount of the loss sustained by him. The facts here clearly fall within the purview of our holding in the cases cited. While the petitioner in 1943 did have a reasonable prospect of the collection of his insurance on the ship, he did not know until 1944 that it would be collected, and if so, in what amount. We are unimpressed by respondent's contention that because the petitioner's investment *66 in the ship was $54,000 and his insurance coverage was only $40,000, it was known in 1943 that he would certainly sustain a loss of the difference between these amounts, and hence should have claimed deduction in that year. In 1943 he did not know whether he would collect any of the insurance or not, and hence the amount of his loss was unascertainable until 1944. Decision will be entered for petitioner. Footnotes
1. The record does not disclose the nature of the P. & I. coverage but it was apparently some type of liability insurance.↩